FILED

2021 Aug-31  PM 06:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

STEPHANIE RENE' COLE,  }
         }
  **Plaintiff,**    }
         }
         }
**v.**         }
         }  **Case No.:  2:20-cv-00733-MHH**
         }
KILOLO KIJAKAZI,   }
         }
**Acting Commissioner of the Social** }
**Security Administration,**[1]  }
         }
  **Defendant.**   }
         }

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. § 405(g), claimant Stephanie Rene' Cole seeks judicial review of a final adverse decision of the Commissioner of Social Security.  The Commissioner decided that Ms. Cole no longer is disabled, and the Appeals Council denied review.

---

[1] The Court asks the Clerk to please substitute Kilolo Kijakazi for Andrew Saul as the defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See* FED. R. CIV. P. 25(d) (When a public officer leaves office, that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

After filing her appeal in this Court, Ms. Cole moved to expand the administrative record and remand her appeal pursuant to Sentence Six of 42 U.S.C. § 405(g). A Sentence Six remand is appropriate when a claimant establishes that there is new, noncumulative evidence; that the evidence is material such that a reasonable probability exists it will change the administrative result; and that there was good cause for failure to submit the evidence at the administrative level. *See Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 821 (11th Cir. 2015). Ms. Cole has placed in the record for this appeal the court records that are the subject of her motion to expand the administrative record. (Docs. 26, 26-1). Consistent with the discussion held in the telephone hearing on November 19, 2020, the Court denies Ms. Cole's motion to remand. (11/19/2020 Minute Entry).

The remainder of this opinion resolves the merits of Ms. Cole's appeal.

## STANDARD OF REVIEW

The scope of review in this matter is limited. A district court reviews an ALJ's "'factual findings with deference'" and her "'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510–11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as

adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If the district court finds an error in the ALJ's application of the law, or if the district court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

## PROCEDURAL HISTORY

Ms. Cole applied for a period of disability and disability insurance benefits on March 22, 2010. (Doc. 14-7). Ms. Cole's disability began November 1, 2009. (Doc. 14-3, p. 22). Ms. Cole was awarded benefits in April of 2010. (Doc. 14-8, p. 19). On July 3, 2014, the Commissioner conducted a continuing disability review to

determine if Ms. Cole still was entitled to benefits. (Doc. 14-3, p. 24). The Commissioner determined that Ms. Cole was disabled on that date and issued a favorable opinion. (Doc. 14-3, p. 24). On September 10, 2018, the Commissioner conducted a second disability review and determined that Ms. Cole's health had improved since the previous review. (Doc. 14-3, p. 22).

Ms. Cole disagreed with the Commissioner's 2018 decision, so she requested a hearing before an Administrative Law Judge. (Doc. 14-3, p. 22). Ms. Cole appeared and testified at the administrative hearing on October 29, 2019. (Doc. 14-3, p. 22). In an opinion dated January 27, 2020, the ALJ concluded that Ms. Cole's disability ended on September 30, 2018, and that she had not been disabled again since that date. (Doc. 14-3, pp. 19–34). The Appeals Council declined Ms. Cole's request for review, (Doc. 14-3, pp. 5–16), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g) and § 1383(c).

## SUMMARY OF THE ALJ'S DECISION

The Commissioner must periodically review a disability benefit recipient's continued entitlement to benefits. 42 U.S.C. § 423(f); 20 C.F.R. § 404.1594a(a) (2020). To determine whether a claimant is still disabled, an ALJ follows an eight-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is engaging in substantial gainful activity; (2) if not gainfully employed, whether the claimant has an impairment or

4

combination of impairments that meets or equals a listed condition; (3) if impairments do not meet a listing, whether there has been medical improvement; (4) if there has been medical improvement, whether the improvement is related to the claimant's ability to do work; (5) if there is improvement not related to the claimant's ability to do work, whether an exception to medical improvement applies, . . . (6) if medical improvement is related to the claimant's ability to do work or if an exception applies, whether the complainant has a "severe impairment," . . . (7) if the claimant has a severe impairment, whether the claimant can perform past relevant work; and (8) if the claimant cannot perform past relevant work, whether the claimant can perform other work.

*Klaes v. Commissioner of Social Security*, 719 Fed. Appx. 893, 895 (11th Cir. 2017)

(citing 20 C.F.R.§ 404.1594(f)(1)-(8)).

Ms. Cole was found disabled beginning on November 1, 2009, and she began receiving benefits shortly after this determination. (Doc. 14-3, p. 22). The Social Security Commission determined Ms. Cole's disability continued as of July 3, 2014. (Doc. 14-3, pp. 22, 24). At that time, Ms. Cole suffered from the following medically determinable impairments: Bipolar Affective Disorder, Manic Type, Recurrent, Severe, and with Psychosis; Anxiety Disorder, not otherwise specified; Marijuana Abuse; and Alcohol Abuse. (Doc. 14-3, p. 24). On September 30, 2018, the Social Security Commission determined that Ms. Cole no longer was disabled even though Ms. Cole had the following medical determinable impairments: Bipolar Disorder, Personality Disorder, Post-Traumatic Stress Disorder, Alopecia, and Eczema. (Doc. 14-3, pp. 22, 24). The ALJ concluded that, since September 30, 2018, Ms. Cole has not had a medical impairment, either singly or in combination,

which met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 14-3, pp. 24–25).

The ALJ determined that Ms. Cole has moderate limitation in interacting with others and managing herself and that Ms. Cole has a mild limitation with regard to concentrating, persisting, or maintaining pace. (Doc. 14-3, pp. 25–26). The ALJ found that, by September 30, 2018, Ms. Cole "had not experienced any episodes of psychosis or acute decompensation for years" and that her "mental status examination findings were all within normal limits," except for Ms. Cole's mental affect. (Doc. 14-3, p. 26). The ALJ explained that Ms. Cole's symptoms were not disabling as long as Ms. Cole regularly took her psychotropic medication and that the medical evidence indicates that Ms. Cole suffered from mental decompensation when she did not comply with her medication regimen. (Doc. 14-3, p. 28). In light of Ms. Cole's impairments, the ALJ evaluated Ms. Cole's residual functional capacity and determined that:

> Since September 30, 2018, [Ms. Cole] has had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: She is able to understand, remember, and carry out simple instructions and tasks for two-hour blocks of time. She can tolerate changes in the workplace that are infrequent and gradually introduced. She can have occasional work-related interactions with supervisors, co-workers, and the general public, however she should not perform tandem tasks. She will benefit from jobs that do not have strict production requirements but end of the day requirements would be acceptable.

(Doc. 14-3, p. 27).

6

At Ms. Cole's administrative hearing, the ALJ posed questions to a vocational expert concerning a hypothetical individual similar to Ms. Cole in age, educational level, past relevant work, and residual functional capacity.  Based on the VE's response to the hypothetical questions, the ALJ found that Ms. Cole is not capable of performing her past relevant work as a teller but that medium exertion, unskilled jobs exist in the national economy that Ms. Cole can perform, including janitor, floral stems tier, and cardboard box maker.  (Doc. 14-3, pp. 32–34).  Accordingly, the ALJ determined that Ms. Cole's disability under sections 216(i) and 223(f) of the Social Security Act ended on September 30, 2018, and that Ms. Cole had not become disabled again since that date.   (Doc. 14-3, p. 34).

## ADMINISTRATIVE RECORD EVIDENCE

The administrative record in this case contains medical opinion evidence, objective medical evidence, and third-party evidence.

### *Objective Medical Evidence*

The medical record demonstrates that Ms. Cole was diagnosed with bipolar disorder, personality disorder, and post-traumatic stress disorder following several traumatic events in 2009.  (Doc. 14-11, pp. 68–71).  From 2010 through 2014, Ms. Cole was hospitalized several times for mental health treatment.  (Doc. 14-11, p. 68).  Ms. Cole has been treated with psychotropic medication and counseling, and

between 2014 and September of 2018, she did not require inpatient psychiatric treatment because she was stable on her medications.  (Doc. 14-11, p. 68).

In July of 2017, Ms. Cole went to the Norwood Clinic because she suspected she was pregnant.  (Doc. 14-10, p. 33).  During her appointment, Ms. Cole was alert and cooperative, and she had a normal mood, affect, attention span, and concentration.  (Doc. 14-10, p. 36).  She reported that she was not taking medication for her bipolar disorder.  (Doc. 14-10, p. 33).  Dr. Siddharth Shah determined that Ms. Cole was pregnant and ordered her to immediately stop taking all medications.  (Doc. 14-10, pp. 33, 52).

Ms. Cole appeared for a prenatal appointment in August of 2017.  Ms. Cole explained that she was very stressed because her fiancé's mother was not supportive of her marriage or pregnancy.  (Doc. 14-10, p. 161).  Ms. Cole reported that her depression was worsening due to the stress, and the medical report indicated that Ms. Cole's Edinburgh score was 15.[2]  (Doc. 14-10, p. 161).  Ms. Cole said that she had taken Latuda during her previous pregnancy, which worked well for her.  (Doc.

_____

[2] The Edinburgh Postnatal Depression Scale is "a set of 10 screening questions that can indicate whether a parent has symptoms that are common in women with depression and anxiety during pregnancy and in the year following the birth of a child." *Edinburgh Postnatal Depression Scale (EPDS)*, PERINATAL SERVICES BC, http://www.perinatalservicesbc.ca/health-professionals/professional-resources/health-promo/edinburgh-postnatal-depression-scale-(epds) (last accessed August 31, 2021).  If a patient scores above 13 on the scale, she is more likely to be suffering from a depressive illness.  *See Edinburgh Postnatal Depression Scale*, https://www.fresno.ucsf.edu/pediatrics/downloads/edinburghscale.pdf (last accessed August 31, 2021).

14-10, p. 161).  Ms. Cole's physician prescribed Zoloft—an anti-depressant.  (Doc. 14-10, p. 115; Doc. 14-8, p. 135).  From November 2017 to April 2018, Ms. Cole's Zoloft prescribed dosage was increased from 25mg a day to 50mg.  (Doc. 14-11, p. 51).  On April 10, 2018, Ms. Cole went to a scheduled postpartum visit.  (Doc. 14-11, p. 7).  Ms. Cole was taking 50 mg of Zoloft daily at the time of her postpartum visit.  (Doc. 14-11, p. 7).  Ms. Cole had a stable mood and an Edinburgh score of 3.  (Doc. 14-11, p. 7).  Ms. Cole's physician instructed her to continue Zoloft.  (Doc. 14-11, p. 7).

Ms. Cole went to the emergency room in November of 2018 because she was having suicidal thoughts.  (Doc. 14-11, p. 106).  Ms. Cole said she briefly contemplated suicide, but she was "quick to say that she is rational and would never act on those impulses because she has children at home."  (Doc. 14-11, p. 106).  Ms. Cole denied hallucinations.  (Doc. 14-11, p. 106).  Ms. Cole was discharged from the hospital, and Ms. Cole's Zoloft prescription was increased from 50mg to 100mg.  (Doc. 14-11, p. 106; Doc. 14-9, p. 53).

In February of 2019, a few months after her disability review began, Ms. Cole was admitted to UAB Hospital.  (Doc. 14-11, p. 164).  Ms. Cole was found walking in the rain, saying repeatedly "I need to find Jesus love."  (Doc. 14-11, p. 164).  Ms. Cole was delusional.  (Doc. 14-11, p. 164).  Dr. Norman Huggins, a psychiatrist at UAB Hospital, and Marcy McLain, LPC, submitted letters to the Disability Hearing

Officer to explain that Ms. Cole had been hospitalized.  (Doc. 14-11, pp. 115–116).  While Ms. Cole was hospitalized, Ms. McClain explained that she was unable to complete the full mental health assessment on Ms. Cole because of her level of decompensation.  Ms. McClain determined that Ms. Cole was "a danger to herself and others."  (Doc. 14-11, p. 116).

Over the week that she was hospitalized, Ms. Cole complied with her medications and treatment, and she stabilized.  (Doc. 14-11, p. 197).  Ms. Cole's treating physician, Dr. Sooraj John, concluded that her state when she was admitted was "in the context of medication noncompliance" and social stressors.  (Doc. 14-11, p. 175).  Dr. John noted that Ms. Cole reported "effectiveness of Latuda in the past and multiple years without hospitalization," but "she endorsed self-discontinuation of Latuda during her most recent pregnancy and failed to resume mediation after the birth of her youngest child."  (Doc. 14-11, p. 175).  Ms. Cole was discharged on February 25, 2019 with a prescription for Latuda.  (Doc. 14-11, p. 175).

On March 12, 2019, Ms. Cole was admitted to Hill Crest Behavioral Health Services under court order.  Because she had not complied with her medication, Ms. Cole had decompensated and threatened to harm her children.  (Doc. 14-12, p. 5).  Ms. Cole was uncooperative, had a flight of ideas, and may have been responding to internal stimuli.  (Doc. 14-12, p. 6).  Ms. Cole's speech was hyperverbal, and her

motor activity was hyper.  (Doc. 14-12, p. 6).  She was not assaultive, suicidal, or homicidal.  (Doc. 14-12, p. 6).  Over ten days in the hospital, Ms. Cole's condition improved with medication.  (Doc. 14-12, p. 22).  Ms. Cole was discharged to her home.  (Doc. 14-12, pp. 22–23).

Several months later, Ms. Cole reported that she was doing "really good," staying active, and working part-time.  (Doc. 14-12, p. 74).  She was able to see her children who were in her mother's custody.  (Doc. 14-12, p. 74).  Ms. Cole credited her improvements to compliance with medication.  (Doc. 14-12, p. 74).

***Medical Opinion Evidence***

In a psychological evaluation dated August 21, 2018, Dr. Sally Gordon noted that Ms. Cole had taken Zoloft and three other medications within the past 24 hours. (Doc. 14-11, p. 69).  Ms. Cole was neatly-groomed, and her affect was insouciant and incongruent when she described her past symptoms and trauma.  (Doc. 14-11, pp. 69–70).  In her evaluation report, Dr. Gordon provided the following summary of Ms. Cole's mental health status and her ability to maintain employment:

> The claimant presents with a history of anxiety, panic attacks, posttraumatic stress, and past diagnoses of bipolar disorder and polysubstance abuse. She also appears to have a long history of maladaptive behavior traits that contribute to her difficulties and general level of impairment. In this evaluation she displayed a normal level of intelligence. Her receptive and expressive language skills appeared to be within normal limits. Her recent and remote memory appeared to be intact and her immediate memory tested in the average range. Her verbal auditory attention, judgment, verbal abstract reasoning, fund of information, calculation skills, and reading skills

11

appeared to be within normal limits on brief testing. The information obtained in this evaluation and her medical records suggests that her psychiatric issues are likely to interfere significantly with her ability to work. She appears to be capable of learning and remembering work instructions, but she is likely to be frequently absent due to incapacitation by her psychiatric disturbances, and even when present on the job she is likely to have difficulty maintaining an adequate level of concentration, attention to detail, and work productivity. She is also likely to have difficulty maintaining amicable relationships with her coworkers and responding adaptively for work pressures on a consistent basis. She appears to require support in managing the responsibilities of daily living. Due to her past history of "misspending" large sums of money, she is not capable of independently managing her financial benefits.

(Doc. 14-11, p. 71).

On September 7, 2018, Ms. Cole was evaluated by Dr. Peter Sims, a State Agency Psychological Consultant.  After reviewing Ms. Cole's medical records and Dr. Gordon's report, Dr. Sims met with Ms. Cole.  (Doc. 14-5).  In his report, Dr. Sims noted that Ms. Cole explained that she had "highs and lows" in her mood and that she had suicidal and racing thoughts, but she had not been hospitalized for psychiatric episodes for years.  (Doc. 14-5, pp. 11, 23).  Dr. Sims opined that Ms. Cole had a good response to psychotropic medication and decompensated only when she stopped taking her prescribed medication.  (Doc. 140-5, p. 24).  Dr. Sims concluded that Ms. Cole was moderately limited in her abilities to interact with the public, to accept instructions and criticism, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and that she was not significantly limited in her ability to respond to changes in the work setting.  (Doc.

14-5, p. 34).   Dr. Sims opined that Ms. Cole could maintain concentration in performing work-related tasks for two hours.  (Doc. 14-5, p. 35).

During her February 2019 hospitalization, Dr. Huggins noted that Ms. Cole would "have periods of relapse," would "continue to require long term, ongoing treatment" for her bipolar disorder, and would "experience the severe symptoms of Bipolar Disorder for a period that will extend 12 months' time," making her unable to work.  (Doc. 14-11, p. 115).

***Third Party Statements***

In support of her benefits application, Ms. Cole submitted several third party statements from nonmedical sources, including affidavits from Paula Muncey, Terry Carlisle, Carrie Norris, Russell Beasley, Lois Beasley Carlisle, Jessica Hosey, Shannen Allred, and Tim Andrew Muncey.  (Doc. 14-8, pp. 44–51, 61–89, 136–146).  The affidavits describe difficulties that Ms. Cole experiences in her daily life.

For example, Paula Muncey, one of Ms. Cole's friends and nanny of Ms. Cole's children, noted that Ms. Cole "stays chronically stressed" and her "past traumas and current stresses hinder her from obtaining or maintaining gainful employment."  (Doc. 14-8, p. 47).  Ms. Beasley-Carlisle, Ms. Cole's mother, explained that she lets Ms. Cole come work at her law office once a week for a couple of hours, but Ms. Cole has difficulty working, even though it is a very structured working environment.  (Doc. 14-8, p. 51).  Russel Beasley, Ms. Cole's

father, asserted that Ms. Cole is afraid of being in crowds and often has panic attacks. (Doc. 14-8, p. 85). The affidavits from Jessica Hosey, Shannen Allred, and Tim Andrew Muncey describe how Ms. Cole made bizarre statements, had difficulty concentrating or remembering things that had just happened, and made threats to harm herself and others in February of 2019, shortly before she was hospitalized at UAB for inpatient psychiatric treatment. (Doc. 14-8, pp. 136–146).

### DHR Records Related to Custody of Ms. Cole's Children

Ms. Cole has three children. (Doc. 14-11, p. 70). On February 20, 2019, after Ms. Cole was hospitalized, dependent petitions were filed on behalf of Ms. Cole's children. (Doc. 26-1). The Jefferson County Department of Human Resources took custody of the children and placed them in the care of Ms. Cole's mother. (Doc. 26-1, p. 7). Because these records have the children's names, birthdates, and home addresses, the ALJ separated these records from Ms. Cole's other records and put them in a private folder. (Doc. 14-4, p. 6).

## ANALYSIS

Ms. Cole argues that she is entitled to relief from the ALJ's decision for several reasons:

1. The ALJ gave the wrong weight to medication noncompliance.
2. The ALJ committed reversible error stating that Ms. Cole "has only decompensated when she has stopped taking her medication" (Doc 14- 3 p28).
3. The ALJ committed reversable error in ruling Ms. Cole has "not become disabled again since" September 30, 2018 (Doc  14- 3 p25-

26), as she had multiple extended hospitalizations in 2019 and 2020 for her ongoing and continuous and disabling conditions that relate back to her disabling conditions from 2009.

4.   The ALJ erroneously ruled to have probative records put in a private and separate folder, undermining their significance and/or relation to Ms. Cole's disabilities (Doc 14-4p6). Further, ALJ failed to include said records for review or appeal.

5.   The ALJ did not properly weigh the opinions of all medical professionals and treatment records including but not limited to, treating Psychiatrist Norman Huggins, M.D., Marcy McLain, LPC.NCC, and Sally A. Gordon Psy.D., all of whom met with Ms. Cole, reviewed records, and determined her to be disabled.

6.   The ALJ prejudicially found the opinion of Dr. Sims, who only reviewed a portion of Ms. Cole's medical records without meeting with her, to be "highly persuasive".

7.   The ALJ erred in her assessment of Ms. Cole's subjective complaints and credibility (Doc 14-3p30).

8.   The ALJ failed to recognize the significance of statements from family and friends (SSR 96-7p).

9.   The ALJ's conclusion that Ms. Cole can work is erroneous {(Doc 14-3p27) (Doc 14-3p33)} [*sic*]. The ALJ failed to recognize that Ms. Cole's combination of impairments has left her disabled and unable to work.

(Doc. 27, pp. 1–2). Because many of these issues are similar, the Court combines some of the issues. The Court begins its analysis with a review of the ALJ's evaluation of evidence related to Ms. Cole's alleged medication noncompliance and other relevant medical evidence. From there, the Court will consider whether ALJ properly separated documents pertaining to custody of Ms. Cole's children from the rest of the administrative record and whether the ALJ properly considered and weighed third party nonmedical statements. Last, the Court will determine whether

15

there is substantial evidence to support the ALJ's assessment of Ms. Cole's disabilities and ability to work.

## A. Medication Noncompliance

 Ms. Cole argues that the ALJ erred when she determined that Ms. Cole was capable of work when she took her psychotropic medications because, according to Ms. Cole, she remained compliant with her medication prescriptions but still had severe, disabling symptoms.  (Doc. 27, pp. 12–14).

The ALJ did not err in concluding that Ms. Cole suffers from periods of decompensation and increased psychotic symptoms when she does not take her prescription medication.  When Ms. Cole went to the emergency room in November 2017, she appeared to be compliant with her medication, but she needed a higher dosage.  For several months, after her medication was adjusted, Ms. Cole did not experience disabling symptoms.  According to her medical records, when Ms. Cole was hospitalized in 2019, she had decompensated because she did not take her medication, and she stabilized when she began taking her medication as prescribed. Therefore, substantial evidence supports the ALJ's decision with respect to Ms. Cole's medication noncompliance.

Ms. Cole argues that the ALJ failed to consider that medication noncompliance is a symptom of bipolar disorder and that individuals with bipolar disorder "suffer from disabling symptoms for long periods of time" without

16

stabilization of their condition.  (Doc. 27, p. 13).  In support of this argument, Ms. Cole cites the DSM-5 which states: "[f]unctional recovery [for individuals with bipolar disorder] lags substantially behind recovery from symptoms, especially with respect to occupational recovery, resulting in lower socioeconomic status despite equivalent levels of education with the general population."  (Doc. 27, p. 13).  Here, after Ms. Cole was released from her second hospitalization, she reported that she was able to see her children and work part-time because her symptoms improved with medication compliance.  (Doc. 14-12, p. 74).  Thus, Ms. Cole's medical records do not indicate that she struggled to resume work when she took her medication properly.[3]

## B. Weight of Medical Evidence

Ms. Cole argues that the ALJ improperly discredited medical records from her treating medical professionals, Dr. Huggins and Marcy McClain, and from Dr. Gordon and gave Dr. Sims's conclusions about her medical conditions too much weight.  In her opinion, the ALJ found Dr. Gordon's opinions somewhat persuasive because they were mostly consistent with Ms. Cole's medical records.  The ALJ explained that Dr. Huggins's and Ms. McClain's letters were not persuasive (though

---

[3] Ms. Cole's mother indicated that Ms. Cole works for her for only a few hours one day per week. (Doc. 14-8, p. 51).  Still, substantial evidence supports the ALJ's finding that Ms. Cole was able to work despite her struggles with bipolar disorder.

the ALJ did consider the evidence) because this evidence related to a period of Ms. Cole's decompensation for which she was hospitalized and later recovered.

The regulatory framework for review of medical evidence has changed for claims filed after March 27, 2017 or for claims under continuing disability review. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017); *see also* "Continuing disability review (CDR)," PROGRAM OPERATIONS MANUAL SYSTEM DI 24503.050(D)(7), https://secure.ssa.gov/poms.nsf/lnx/0424503050 (last accessed August 31, 2021) (explaining that the current regulations apply to continuing disability review cases unless the continuing disability review is the first review for the claim after March 27, 2017; the ALJ finds there is no medical improvement related to the claimant's ability to work; and all medical determinations made in the claim were made using the prior rules). These changes apply to this case because Ms. Cole's case was under continuing disability review, and the ALJ determined that Ms. Cole had experienced medical improvement related to her ability to work. (Doc. 14-3, p. 26).

Under the new regulations, evidence falls into five categories: objective medical evidence, including laboratory findings; medical opinions, meaning "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions;" "other medical evidence" which includes all non-objective medical

18

evidence such as medical history, diagnoses, and "judgments about the nature and severity of your impairments;" evidence from non-medical sources such as family members, employers, or others who have information relevant to an application for benefits; and prior administrative medical findings, which are findings, "other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see [20 C.F.R] § 404.900) in your current claim based on their review of the evidence in your case record . . . ."  20 C.F.R. § 404.1513(a).

Under the new regulations, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [claimant's own] medical sources."  20 C.F.R. § 404.1520c(a).  Instead, an ALJ must evaluate each medical opinion using the following five factors:

(1) **Supportability.** The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) **Consistency.** The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

(3) **Relationship with the claimant.** This factor combines consideration of the issues in paragraphs (c)(3)(i)-(v) of this section.

19

    i.    Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

    ii.    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

    iii.    Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s).

    iv.    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s).

    v.    Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.

(4) **Specialization.** The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

(5) **Other factors.** We will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding. This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements. When we consider a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive.

20 C.F.R. § 404.1520c(c)(1)-(5).

In her written decision, an ALJ must state the extent to which she found the medical opinions and prior administrative medical findings in the record persuasive, using the following criteria:

(1) **Source-Level Articulation.** Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) **Most Important Factors.** The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) **Equally Persuasive Medical Opinions or Prior Administrative Medical Findings About the Same Issue.** When we find that two or more medical opinions or prior administrative medical findings

21

about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)–(3).

The new regulations do not address the way in which an ALJ should weigh other evidence including diagnoses that do not include opinions concerning impairment-related limitations or restrictions, objective medical evidence such as test results, and testimony provided during administrative hearings. The regulations state that an ALJ does not have to explain how she considered evidence from non-medical sources using the standards in 20 C.F.R. § 404.1520c(a), (b), and (c). 20 C.F.R. § 405.1520c(d).

The ALJ properly considered the medical opinions of Dr. Huggins, Ms. McClain, Dr. Gordon, and Dr. Sims.

***Dr. Huggins and Ms. McClain***

Dr. Huggins and Ms. McClain submitted letters to the Commissioner shortly after Ms. Cole was hospitalized in February of 2019. (Doc. 14-11, pp. 115–116). Their statements indicate that they believed Ms. Cole was disabled and that her mental health symptoms prevented her from working. (Doc. 14-11, pp. 115–116). The ALJ explained that Dr. Huggins's and Ms. McClain's "opinions are statements

22

on issues reserved to the Commissioner that are inherently neither valuable nor persuasive to the issues of whether the claimant is disabled." (Doc. 14-3, p. 32). Additionally, the ALJ discredited these statements because the "statements were made during a period of [Ms. Cole's] acute decompensation precipitated by the claimant's medication noncompliance." (Doc. 14-3, p. 32).

The ALJ appropriately weighed this evidence. With respect to Dr. Huggins's and Ms. McClain's conclusions that Ms. Cole is disabled and cannot work, the ALJ may disregard these opinions. *See* 20 C.F.R. § 404.1520b(c)(3)(i) (explaining that the determination whether an individual is disabled and unable to work is one strictly reserved to the Commissioner). The ALJ considered the balance of Dr. Huggins's and Ms. McClain's medical opinions in determining Ms. Cole's RFC. (Doc. 14-3, p. 32). The ALJ did not have to afford Dr. Huggins and Ms. McClain substantial weight as treating physicians because the regulations no longer distinguish between the weight given to treating physicians and consultative physicians. 20 C.F.R. § 404.1520c(a). The ALJ did not improperly weigh the medical opinions of Dr. Huggins and Ms. McClain.

### Dr. Gordon

Ms. Cole argues that the ALJ did not give Dr. Gordon's consultative mental examination report sufficient weight. (Doc. 27, pp. 19–21). Specifically, Ms. Cole asserts that the ALJ disregarded Dr. Gordon's conclusions that Ms. Cole would

likely be absent at work due to her mental health and that she would have difficulty maintaining concentration or amicable relationships with coworkers.  (Doc. 27, p. 20).

After the ALJ discussed Dr. Gordon's report in her opinion, the ALJ found Dr. Gordon's medical opinions somewhat persuasive.  (Doc. 14-3, p. 31).  The ALJ explained that some of Dr. Gordon's report is not well-supported by objective medical evidence or other evidence in the administrative record because "it appears that Dr. Gordon relied heavily upon the claimant's subjective report of symptoms and limitations despite the evidence that the claimant was trying to exaggerate her symptoms."  (Doc. 14-3, p. 31).  The ALJ noted that Dr. Gordon opined that Ms. Cole would likely experience difficulty in maintaining concentration, which the ALJ believed was inconsistent with Dr. Gordon's observation that Ms. Cole remained cooperative and alert during the examination even though her phone continued to vibrate.  (Doc. 14-3, p. 31).  The ALJ questioned whether Ms. Cole was medicated during Dr. Gordon's examination because there was medical evidence suggesting that Ms. Cole discontinued medication while she was pregnant.  (Doc. 14-3, p. 32).

Pursuant to the new regulations, the ALJ sufficiently explained why she partially discredited Dr. Gordon's report.  The ALJ cited specific medical evidence that undermined some of Dr. Gordon's conclusions and explained why she believed Dr. Gordon's opinions were inconsistent with the remainder of the record due to Dr.

Gordon's reliance on Ms. Cole's subjective complaints, despite evidence that Ms. Cole exaggerated her symptoms during the examination.  Because the ALJ properly reviewed this evidence and explained her reasoning, this Court will not reweigh the evidence or substitute its judgment for that of the ALJ.  *See Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004)).

### *Dr. Sims*

Ms. Cole argues that the ALJ "preferred" the opinion of Dr. Sims over the opinions of the other physicians who examined or treated Ms. Cole.  (Doc. 31, p. 8). The ALJ held that Dr. Sims's report was highly persuasive because his opinions "are well supported by extensive citation to objective evidence and rationale, and they are consistent with the other evidence in the administrative record, including the claimant's mental health treatment records."  (Doc. 14-3, p. 32).  For example, the ALJ explained that Dr. Sims and Dr. Gordon found Ms. Cole had some limitations with attention and concentration and that she may have difficulty interacting with the public.  (Doc. 14-3, pp. 31–32; Doc. 14-5, pp. 34–35; Doc. 14-11, p. 71).  The ALJ sufficiently explained why she believed Dr. Sims's report was supported by the medical evidence and consistent with the remainder of the record.

Ms. Cole argues that Dr. Sims's opinions were not reliable because Dr. Sims did not review medical records related to inpatient hospitalizations that occurred

after his examination.  (Doc. 27, pp. 22–24).  Dr. Sims reported that he reviewed Ms. Cole's administrative record and medical evidence from March of 2014 through September of 2018.  (Doc. 14-5, pp. 4–6).  Dr. Sims did not fail to consider relevant medical records in that time period, and he considered more records than Dr. Gordon had considered in her earlier consultative examination.   (Doc. 14-3, p. 32). Additionally, while Dr. Sims considered Ms. Cole's medical history up to September of 2018, the ALJ considered all of Ms. Cole's medical evidence and properly explained how she evaluated Dr. Sims's report in that context.  Substantial evidence supports the ALJ's findings regarding the medical evidence.

### C. Evidence Pertaining to Ms. Cole's Children

In the administrative hearing, the ALJ explained that she separated from the rest of the administrative record DHR records concerning Ms. Cole's loss of custody of her children because of her mental illness and decompensation in February of 2019.  (Doc. 14-4, p. 6).  Ms. Cole argues that by separating these probative records from the rest of her administrative record, the ALJ minimized the importance of the DHR records.  (Doc. 28, pp. 18–19).  Ms. Cole also notes that the ALJ failed to include those records for review or appeal.  (Doc. 27, pp. 18–19).

Ms. Cole has not shown how she was prejudiced by the ALJ's decision to separate the DHR documents from the balance of the administrative record.  During Ms. Cole's administrative hearing, the ALJ explained that the documents were put

into a private section of Ms. Cole's file, but the ALJ gave Ms. Cole the opportunity to address those documents. (Doc. 14-4, p. 6) (noting that Ms. Cole "[can] talk about those" documents in the hearing). Ms. Cole did not object. (Doc. 14-4, pp. 6–7). Later in the hearing, Ms. Cole explained that the documents in the private folder describe how "DHR took her children" to give custody of them to Ms. Cole's family members and that Ms. Cole was permitted to see her children only in supervised visits. (Doc. 14-4, p. 9). The ALJ asked Ms. Cole whether she lived with and cared for her children independently before the DHR took custody of them, and Ms. Cole explained that she had. (Doc. 14-4, pp. 13–14). In her opinion, the ALJ weighed the fact that Ms. Cole did not have custody of her children, citing a therapy note that stated the children were in custody of Ms. Cole's mother. (Doc. 14-3, p. 30 (citing 14-12, p. 74)).

The DHR records qualify as evidence from a non-medical source, but any error in separating them from the administrative record is harmless. *See Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (applying the harmless error analysis in Social Security cases and holding that a harmless error is one that does not affect the ALJ's ultimate decision); *see also Sarli v. Berryhill*, 817 Fed. Appx. 916, 919 (11th Cir. 2020) (holding that ALJ committed harmless error when she did not state the weight she gave to the state agency consulting psychologists' opinions because the opinions were consistent with the ALJ's determination of the claimant's residual

27

functioning capacity).  Though she did not refer to the DHR records in her opinion, the ALJ considered the fact that Ms. Cole lost custody of her children in determining whether Ms. Cole's mental health was disabling. Therefore, the ALJ did not commit reversable error in separating the documents.

### D. Weight Assigned to Third Party Statements

Ms. Cole submitted several third-party statements from nonmedical sources, including her friends, family, and neighbors. Ms. Cole asserts that the statements attest to her "bizarre and reclusive behavior" and her inability to care for herself or her children.  (Doc. 31, p. 9).

Under the new regulations, an ALJ does not have to explain how she weighed or considered nonmedical evidence.  20 C.F.R. § 404.1520c(d).  In her opinion, the ALJ noted that she reviewed the statements from Ms. Cole's friends, family, and neighbors, but she did not explain how she weighed this evidence—which is permissible under § 404.1520c(d).  Therefore, Ms. Cole has not identified error regarding this nonmedical evidence.

### E. Substantial Evidence Supports the ALJ's Decision

Ms. Cole argues that the ALJ improperly assessed her (Ms. Cole's) subjective statements and that substantial evidence contradicts the ALJ's decision that Ms. Cole could work.  (Doc. 27, pp. 24–27, 32).  Ms. Cole asserts that the ALJ picked some statements from her medical record to support the conclusion that her medical

28

condition has improved without considering whether Ms. Cole tried to appear better than she actually was to regain custody of her children.  (Doc. 27, p. 26).

Substantial evidence supports the ALJ's finding that Ms. Cole was able to work because her medical conditions had improved since 2014.  The ALJ considered all objective medical evidence, all nonmedical evidence, and Ms. Cole's testimony during the administrative hearing, and, as discussed in other sections, the ALJ properly weighed this evidence.  The ALJ has wide discretion to evaluate the weight of the evidence and make credibility determinations.  *Ryan v. Heckler*, 762 F.2d 939 (11th Cir. 1985) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233 (11th Cir. 1983)) ("Credibility determinations are, of course, for the Secretary, not the courts.").  The Court may not disturb the ALJ's findings in that regard because substantial evidence in the record supports her findings.

### *Medical Evidence Submitted After the ALJ Issued Her Opinion*

After filing this appeal, Ms. Cole submitted additional medical records related to her inpatient psychiatric treatments in 2020.  In March of 2020, Ms. Cole was hospitalized because of "worsening psychosis."  (Doc. 6, p. 10).  Ms. Cole was "quite distractible, erratic and disorganized," and she had "delayed speech pattern, thought blocking and poor eye contact."  (Doc. 6, p. 10).  Ms. Cole exhibited these symptoms because "she missed her last follow up appointment . . . and was unable to get refills

of Latuda." (Doc. 6, p. 10). Ms. Cole's mood stabilized when she restarted Latuda at 80 mg daily. (Doc. 6, p. 16).

Ms. Cole also submitted a letter from Dr. Erin Hanover which indicates that Ms. Cole was treated for psychosis and mania on June 4, 2020. (Doc. 5, p. 2). Ms. Cole was treated for 30 days, but she had not stabilized enough for discharge from the hospital. (Doc. 5, p. 2). Dr. Hanover did not describe Ms. Cole's symptoms or the cause of her decompensation, but Dr. Hanover stated, "[t]he issue of out-patient treatment compliance and medication compliance are often a [*sic*] factors in decompensation with mental illness." (Doc. 5, p. 2).

These records postdate the ALJ's decision and were not considered by the Appeals Council. Evidence submitted after the ALJ's decision must be material and timely to be considered. "Evidence is chronologically relevant if it 'relates to the period on or before the date' of the ALJ's decision." *Banks v. Comm'r, Soc. Sec. Admin.*, 686 Fed. Appx. 706, 709 (11th Cir. 2017) (quoting 20 C.F.R. § 416.1476(b)(1)). "Even records that postdate the ALJ's decision may be chronologically relevant when the records assess conditions existing prior to the decision, the physician evaluated medical records from before the ALJ's decision, and there is no evidence of deterioration." *Blackwell v. Saul*, 2020 WL 5203992, *5 (N.D. Ala. Sept. 1, 2020) (citing *Washington v. Soc. Sec. Admin., Comm'r*, 806 F.3d 1317, 1322 (11th Cir. 2015)); *see also Ring v. Soc. Sec. Admin., Comm'r*, 728 Fed.

Appx. 966, 968 (11th Cir. 2018).  Evidence is "material, and thus warrants a remand, if there is a reasonable possibility that the new evidence would change the administrative outcome." *Flowers v. Comm'r of Soc. Sec.*, 441 Fed. Appx. 735, 745 (11th Cir. 2011).

The evidence related to Ms. Cole's 2020 inpatient treatments is not material because this evidence would not change the ALJ's determination.  This evidence shows that Ms. Cole's symptoms increase when she does not take her medication; in both hospitalizations in 2020, the records suggest that Ms. Cole stopped taking her medication and then suffered from mental health episodes, much as she did when she was hospitalized in 2019.  Periods of decompensation in the administrative record before the ALJ similarly link decompensation to prescription medication non-compliance.  Therefore, the Court will not consider this evidence or remand to the ALJ for evaluation of this evidence.

## CONCLUSION

For the reasons discussed above, the Court affirms the decision of the Commissioner of Social Security.

**DONE** and **ORDERED** this August 31, 2021.

_____

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE